PAUL ALSTON                1126
J. BLAINE ROGERS           8606
CLAIRE WONG BLACK          9645
LUCAS J. MYERS             9991
ALSTON HUNT FLOYD & ING
1001 Bishop Street, Suite 1800
Honolulu, HI  96813
Telephone: (808) 524 1800
Facsimile: (808) 524 4591
Email:      palston@ahfi.com
            cblack@ahfi.com
            brogers@ahfi.com
            lmyers@ahfi.com


VICTOR GEMINIANI           4354
GAVIN THORNTON             7922
HAWAI`I APPLESEED CENTER FOR
LAW AND ECONOMIC JUSTICE
119 Merchant Street, Suite 605
Honolulu, HI  96813
Telephone: (808) 587-7605
Email:      victor@hiappleseed.org
            gavin@hiappleseed.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| FAITH ACTION FOR COMMUNITY EQUITY; TOCHIRO KOCHIRO KOVAC, individually and on behalf of a class of persons in the State of Hawai`i who, because of their national origins, have limited English proficiency;<br><br>    Plaintiffs,<br><br>  vs. | Case No. CV-13-00450 SOM RLP<br>Civil Rights Action<br>Class Action<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES; CERTIFICATE OF SERVICE** |

HAWAI`I DEPARTMENT OF
TRANSPORTATION; GLENN
OKIMOTO, in his official capacity as
the Director of the Hawai`i Department
of Transportation,

      Defendants.

## FIRST AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

### INTRODUCTION

1.     Plaintiffs bring this action for relief from Defendants' violation of Plaintiffs' civil rights under the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, arising out of Defendants' intentional discrimination against people residing in the State of Hawai`i who, because of their national origin, have Limited English Proficiency ("LEP").

2.     Plaintiff **TOCHIRO KOCHIRO KOVAC**, and the class of persons whose interests he represents, are LEP persons of various nationalities who have been unable to obtain a driver's license because of Defendants' adoption of an English-only policy for the driver's license testing requirements, under which Defendants have halted the use of translations of the driver's exam and prohibit the use of interpreters.

889272v1

3. Plaintiff **FAITH ACTION FOR COMMUNITY EQUITY** ("FACE") is an Internal Revenue Code 501(c)(3) non-profit corporation that, along with its member institutions, has been adversely affected by Defendants' English-only policy, which has frustrated FACE's mission and caused it to divert precious and limited resources to ensure that members of the putative class are able to participate in FACE activities. FACE and its member institutions have been advocating for multi-lingual driver's license examinations since 2001, devoting significant resources to that effort.

4. Defendants **HAWAI῾I DEPARTMENT OF TRANSPORTATION** ("HDOT"), and **GLENN OKIMOTO** are responsible for administering the driver's licensing program and for the adoption of HDOT's English-only policy, which is contrary to Defendants' own language access policy adopted in recognition of the necessity of providing language access for HDOT services to avoid discrimination on the basis of national origin.

5. Plaintiffs have filed this suit as a last resort. Over a decade ago, Plaintiff FACE successfully advocated for driver's licensing exam translations for the benefit of Hawai`i's ethnically diverse population. Since the time HDOT ordered that the use of the translations be ceased, representatives of FACE have met with HDOT officials, submitted petitions, issued a report on the issue, and even offered to arrange for the translations to be done at no cost to Defendants. In

889272v1

spite of FACE's efforts, repeated requests, and demands, Defendants have refused to provide translated versions of the driver's license examination materials and/or refused to provide otherwise qualified persons whose primary language is not English ways to obtain licenses in their native languages.

6.      As a result, many people with limited English proficiency are unable to obtain a driver's license.  Having a driver's license is critical to self-sufficiency, especially for those residing in areas where bus service is non-existent or limited.   The inability to drive limits access to employment, education (including getting to classes in order to learn English), medical services, cultural and church activities.  Some members of the class are compelled to drive without a license because they have no other viable means of getting to work and supporting their families.  Some been unable to obtain insurance without a license, and others have been cited for driving without a license, an offense that subjects them to fines or jail time.

7.      Defendants now claim that the reason for their English-only driver's license exam policy is because it is unsafe for people who cannot read English to drive in Hawai`i. Yet Defendants' own policies allow illiterate persons to take the examination orally, and non-English speaking people are allowed to drive using a foreign driver's license for a period of one year before they are required to obtain a Hawai`i driver's license.

8.     Defendants' deliberate refusal to provide translations of the written exam or allow interpretation of the driver's exam in spite of the clear need, and in the absence of any rational basis, reflects, and is a result of, intentional discrimination against individuals with limited-English proficiency.

9.     Plaintiffs seek injunctive and declaratory relief, damages, attorney's fees and costs, and any additional relief as may be just and proper.

**PARTIES**

10.     Plaintiff Tochiro Kochiro Kovac is a Chuukese and a citizen of the Federated States of Micronesia ("FSM").   Mr. Kovac moved from Chuuk to Maui in 2008.   Although he studied English in elementary school, Mr. Kovac speaks Chuukese at home and has had difficulty with the vocabulary and English idioms on the written driver's license exam, which includes words like "inadvertently" and "abreast," and phrases like "ride up."   Despite studying the Official Hawai`i Drivers Manual, Mr. Kovac took and failed the exam four times in 2010.   He attempted to take the written exam again in 2011, but failed—missing eight questions on his last attempt.   At no point during Mr. Kovac's ten attempts to take the exam was he offered a translated exam, and he was never notified of his right to an interpreter.   As a result, Mr. Kovac was injured, and continues to be injured, by the violations of his civil rights alleged herein.

889272v1

11.   Plaintiff FACE is a faith-based grassroots non-profit organization, incorporated in the State of Hawai`i on June 10, 1998.   FACE's membership comprises over 25 Hawai`i institutions including churches, religious communities, community groups, nonprofit organizations and a labor union.   Its membership reflects the cultural and socio-economic diversity of Hawai`i's community:   Some of FACE's member institutions have high concentrations of people who are newcomers to Hawai`i and to the United States.   Many of these people are not U.S. citizens, are of various national origins, and have limited English proficiency ("LEP")—meaning that their primary language is not English and that they are limited in their ability to speak, read, write and understand English.   If fact, FACE often uses interpreters at its meetings and activities to ensure that those with difficulty communicating in English can actively participate.

12.   FACE's mission is grassroots, interfaith, multi-ethnic and multi-issue community organization:   it exists to allow its members to live out common, faith-based values by engaging in actions that challenge the systems that perpetuate poverty and injustice.   FACE conducts social, economic and community activities, and provides leadership development though meetings and workshops. FACE uses a variety of means to accomplish the reforms it seeks, most of which require heavy involvement of the individual members of its member institutions. One of the primary means by which FACE accomplishes its work is through

meetings and workshops with the individual members of its member institutions. The involvement of individual members is critical to the success of FACE's advocacy efforts, and the more people FACE is able to gather for its activities, the more likely those activities are to be successful.

13.    One of FACE's primary areas of advocacy involves addressing and remedying problems faced by recent immigrants to Hawai`i.  In order to determine FACE's areas of advocacy, FACE's membership institutions survey their individual members to identify the issues of greatest importance to them. One of the issues FACE has focused on over the past decade is advocating on behalf of persons of certain nationalities who have been unable to obtain a driver's license due to the lack of translations and interpreter services.  FACE recognizes that lack of a driver's license has significant impact on a person's ability to become self-sufficient, and has invested substantial resources advocating on this issue. During the past decade, FACE has recognized the lack of multilingual driver's license testing as a significant problem for the LEP community, which is a target of its services. Therefore, during that period, FACE and its members have devoted substantial resources to addressing this licensing issue and advocating for the rights of LEP people.

14.    Defendant HDOT is a public entity created by the Legislature of the State of Hawai`i.  Defendant HDOT is a state agency, and receives federal

889272v1

financial assistance, including money from the U.S. Department of Homeland Security.   Defendant HDOT is charged with administering the written driver's license exam.

16. Defendant GLENN OKIMOTO is the Director of the HDOT and is sued in his official capacity.   He is responsible for ensuring the HDOT's compliance with federal nondiscrimination laws.

## CLASS ACTION ALLEGATIONS

16. Plaintiff Tochiro Kochiro Kovac brings this action on behalf of himself and on behalf of a class of all those individuals similarly situated pursuant to Rule 23of the Federal Rules of Civil Procedure.

17. Plaintiff Kovac represents all residents of Hawai`i who are eligible for driver's licenses and who, because of their limited English proficiency and/or national origins, need to take the driver's license examination in a language other than English through translations, interpreters, and other language access services ("the Class").

18. Plaintiff Kovac and his counsel will adequately represent the class. Plaintiff Kovac is represented by counsel experienced in federal civil rights litigation and class actions, including litigation against state defendants based upon violations of federal law.

19.     Membership of the class is so numerous that joinder of all members is impractical.  There are thousands of persons who have limited English proficiency and who are being denied meaningful access to driver's licenses as a result of Defendants' refusal to provide translation and interpretation services.

20.     Common questions of law and fact exist, including whether Defendants are discriminating against the members of the class by refusing to allow translation and interpretation of the driver's license exam into languages other than English.

21.     The claims of Plaintiff Kovac are typical of the claims of the other members of the proposed class in that they all have been denied meaningful access to a driver's license and are otherwise discriminated against on the basis of their national origins.  Plaintiff Kovac will fairly and adequately represent and protect the interests of the Class.  Plaintiff Kovac intends to prosecute this case rigorously in order to secure remedies for the entire class.

22.     A class action is appropriate in this case for one or more of the following reasons:

a.     The prosecution of separate actions by individual members of the class would create a risk of adjudications which would as a practical matter be dispositive of the interests of the other members not parties to the

889272v1

adjudications or substantially impair or impede their ability to protect their interests.

b.     Defendants have acted on grounds generally applicable to the class, making appropriate injunctive or declaratory relief with respect to the class as a whole.

c.     Questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## JURISDICTION

23.     The Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367.

24.     This action is brought pursuant to the Fourteenth Amendment to the United States Constitution, 24 U.S.C. § 2000d ("Title VI"), as well as 42 USC §§ 1983.

25.     Defendants' sovereign immunity, if any, has been explicitly abrogated in suits brought in federal court to enforce Title VI or 42 USC §§ 1983.

26.     Venue is proper to the District of Hawai`i pursuant to 28 U.S.C. §1391(b) because the events giving rise to Plaintiffs' claims occurred in this District.

## STATUTORY FRAMEWORK

27.     The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 USC § 1983, provides that no State shall deny to any person within its jurisdiction the equal protection of the laws.  Defendants' conduct violates Plaintiffs' right to equal protection of the laws by discriminating impermissibly on the basis of national origin.

28.     Section 601 of Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, or national origin by programs or agencies that receive federal funding.  45 USC § 2000d.  The protection from discrimination on the basis of national origin extends to people who have little or no proficiency in English on account of their national origin.

29.     Presidential Executive Order 13166 directs recipients of federal funds to implement a system by which LEP Persons can meaningfully access the services provided by the recipients. 65 Fed. Reg. 50,121 (August 16, 2000).  The Order and its related guidance sets out the standards that recipients of federal funding "*must* follow to ensure that the programs and activities they normally provide in English are accessible to LEP persons and thus do not discriminate on

10

the basis of national origin in violation of title VI of the Civil Rights Act of 1964."

*Id.* at Sec. 1 (emphasis added).

30.    Under Hawai`i Revised Statute § 321C-3, each state agency and covered entities are required to translate documents for the benefit of LEP Persons who seek access.  The policy is subject to a balancing test, which considers:

a.    Number or proportion of Limited English-Proficient Persons served or encountered in the eligible service populations (5% or 1,000 of the population eligible to be served, likely to be affected, or likely to be encountered, whichever is less);

b.    Frequency with which Limited English-Proficient Persons come in contact with the service, programs, or activities;

c.    Nature/importance of the service, programs, or activities; and

d.    Resources available to the State agency or covered entity and the cost of providing translation.

31.    A "limited English proficient person" is defined as "an individual who, *on account of national origin*, does not speak English as the person's primary language and self identifies as having a limited ability to read, write, speak, or understand the English language."   HRS § 321C-2 (emphasis added).

## HDOT'S LANGUAGE ACESS PLAN

32.     HDOT adopted a Language Access Plan (the "Plan") in 2007 in order to comply with the above legal authorities.  The Plan explicitly recognizes the following:

a.      "Language for individuals with LEP can be a barrier to accessing important benefits or services."  Plan at 2.

b.      "The national origin protected category under Title VI gives the statutory authority for nondiscrimination in the provision of services to individuals with LEP."  Id. at 3.

c.      Hawai`i's language access law was adopted to "affirmatively address, *on account of national origin*, the language access needs of LEP persons in Hawai`i."  Id. at 4 (emphasis added).

d.      Hawai`i has a large and growing LEP population.  *Id*. at 2 (stating that "[s]tatewide, 26 percent of households speak a language other than English at home," and recognizing that "[t]he diversity of Hawai`i's population continues to grow.")

33.     The Plan identifies "the most common languages encountered" in Hawai`i as "Tagalog, Japanese, Ilocano, Chinese, Spanish, Hawaiian, Korean, Other Pacific Island Languages (Chuukese, Marshallese, Yapese), Samoan, and Vietnamese." *Id*.

12

34. The Plan states that "[p]erons who apply for a driver's license" are among the populations served by HDOT that are likely to include LEP persons and which "should be considered when planning language access services." *Id.* at 5.

35. The Plan says that "LEP persons have the right to free language assistance in their spoken language." *Id.* at 7.

36. Additionally, the Plan acknowledges that HDOT has an obligation to provide translations of "vital documents," which are defined as "printed documents that provide important information necessary to participate in services, programs, and activities." *Id.* at 8.

37. HDOT officials have acknowledged that the written driver's exam is a vital document.

## FACTS

**History of HDOT's Position on Translations**

38. Defendant HDOT is charged with administering the driver's license exam.

39. Prior to 2001, translations of the exam were not available. However, after FACE engaged in a considerable advocacy effort with the City and County of Honolulu Licensing and Permits Division, translations were implemented for Japanese, Mandarin, Korean, Samoan, Tagalog, Vietnamese, Laotian, and Tongan.

40.     FACE helped to get the translations completed for minimal costs by recruiting university professors and consulates do the translations.  As a result of FACE's work, the total cost to translate and print the exams was around $2,000.

41.     For years, the translations remained in place and provided an effective means of accessing the exam for LEP Persons of the various nationalities for which translations were offered.

42.     However, sometime around 2009, the HDOT pulled the plug on the use of the translated driver's license examination materials that the City and County of Honolulu had put into place.

43.     HDOT has, at one point, claimed the reason they stopped the use of the translations was because legislation had been passed to include a new exam question regarding leaving children unattended in vehicles.

44.     However, HDOT added the additional question to the English exam, allowing English-speakers to access a license without interruption.

45.     HDOT's annual budget has exceeded $1 billion in recent years, and although the cost to translate a single question for the other languages in which the exam had previously been offered would have been nominal—significantly less than the $2000 cost of translating the entire exam—HDOT did not reinstitute the translations.

46.     Additionally, HDOT refuses to allow interpretation of the exam, even where driver's license applicants offer to supply their own interpreters so that it would cost HDOT nothing.

47.     As a result, for *years* LEP people, the vast majority of whom are people of nationalities other than the U.S., have been unable to pass the test and obtain a driver's license.

48.     Approximately eighteen percent of Hawai`i's population consists of immigrants, and a large percentage of them have difficulty with the English language to the extent that they are unable to fulfill the driver's license requirements in light of Defendants' English-only policy. While there may be a small number of U.S. citizens in Hawai`i who are LEP, the percentage of U.S. citizens who are unable to obtain a driver's license due to Defendants' English-only policy is minuscule in comparison to the percentage of non-U.S. citizen who are unable to obtain a license.

49.     Shortly after HDOT stopped the use of the translations, LEP persons began complaining to HDOT and the Hawai`i Office of Language Access about the inaccessibility of a license, but HDOT ignored their complaints and did nothing to translate the additional question and get the translated tests back into circulation.

**FACE's Efforts to Get Defendants to Rescind Their English-Only Policy**

50.    In the beginning of 2013, the issue was brought to the attention of FACE again, which identified the resulting lack of access to a license as a critical issue that has a devastating impact on immigrants since the inability to drive limits access to employment, education (including getting to classes in order to learn English), medical services, cultural and church activities, and even participation in FACE's own activities.

51.    FACE renewed its advocacy for multi-lingual examinations and repeatedly reached out to HDOT to provide information about the great need for translations and the adverse impacts of the problem on immigrants to Hawai`i, and to offer assistance in getting the translations completed. FACE also informed HDOT of the translation needs of people from countries speaking languages other than those for which translations were previously provided, including Ilocano, Chuukese, Marshallese, and Spanish.

52.    When FACE contacted HDOT officials to inquire about why the translations were pulled and what could be done to get them reinstated, the officials responded that it was because of the addition of the question on the driver's exam, for which translation was "unavailable."

53.    On information and belief, it was untrue that translation of the question was unavailable.  Instead, translation of the additional question could

have been obtained readily and for little cost. In fact, HDOT had a policy in place to provide for such translations, and had multilingual staff who were available to assist with making a driver's license accessible to LEP people.

54.     Additionally, when FACE initially contacted HDOT about the issue, FACE offered to translate the exam through its members who are professors and clergy to eliminate or minimize the cost of implementing the translations, as it did in 2001, but was told by HDOT officials "that would not be necessary."

55.     HDOT also told FACE that the issue of translations was "under review."  However, when FACE asked about details of the review including what was being considered and how members of the public could provide input, HDOT refused to respond.

56.     FACE continued contacting HDOT in an attempt to get responses to their questions and have the issue addressed. In April 2013, FACE members submitted a petition to a local driver's licensing office which included more than 300 signatures requesting translations.

57.     Eventually HDOT agreed to meet with FACE to discuss the translation issue. FACE sought Defendant Okimoto's participation at the meeting, but he refused.

58.     Prior to the meeting, FACE drafted and submitted to HDOT a report on the need for translations of the driver's exam. The report explained the

889272v1

devastating consequences HDOT's English-only policy has on Hawai`i's immigrant communities; the significant hidden costs of the English-only policy (e.g., increasing the number of residents driving without insurance because they cannot obtain a license); and how in spite of Hawai`i's unusually high immigrant population, Hawai`i is one of only five states in the nation with an English-only policy.

59.   On May 15, 2013, FACE members and staff, including two non-U.S. citizens—one Chuukese and one Marshallese—flew in from Maui for the meeting.  In addition to the representatives of FACE and HDOT, the director of the Hawai`i state Office of Language Access was present at the meeting.

60.   At the meeting, the representatives from FACE tried to explain the adverse impacts of HDOT's English-only policy on immigrants to Hawai`i. However, HDOT officials acted disinterested and even hostile. HDOT continued its refusal to reveal what it intended to do regarding translations, what its review process would entail, and how the public could provide input.

61.   During the meeting, the HDOT officials refused to allow the director of the Office of Language Access to sit at the table with the other meeting participants, instead requiring that he sit behind the HDOT officials, which made it difficult for the director to participate.  When he did try to participate, the HDOT officials resisted acknowledging his input.

62.     The HDOT official who FACE was told was ultimately responsible for making the determination regarding translations and interpretation never answered a single question that the Chuukese and Marshallese members of FACE's delegation asked of him, though he did respond to questions posed by others.  He refused to acknowledge a long phone conversation he had had with one of the FACE representatives months prior when FACE was just beginning to inquire into the translation issue and determine what could be done.

63.     Much of the meeting consisted of HDOT officials questioning FACE regarding whether there were enough Marshallese and Chuukese people in Hawai`i to justify having translations.  HDOT's acting director for civil rights expressed surprise that there were Marshallese and Chuukese people living on all the islands and asked why Marshallese and Chuukese people had moved to Hawai`i.  He said that he would need exact numbers on how many people from each group would need translations, suggesting that there were not enough to meet the 1000 person threshold in HDOT's Language Access Policy.

64.     About halfway through the time allotted for the meeting, one of the Micronesian members of FACE's delegation began tearing up because she was humiliated by the way that the HDOT officials were treating them. After the FACE delegation consulted among themselves, they decided to end the meeting early to avoid further humiliation and because it was not accomplishing anything.

19

65.     After the meeting, an official from the Office of Language Access emailed the FACE and HDOT representatives who attended the meeting with data showing that the Marshallese and Chuukese populations did in fact meet the threshold.  To FACE's knowledge, HDOT never responded.

66.     In July 2013, FACE made one more attempt to convince Defendants' to rescind the English-only policy, presenting HDOT a letter signed by 40 clergy and 20 Hawai`i agency and organization directors urging Defendant Okimoto to agree to translations.

67.     Defendants ultimately did not reinstate translations of the driver's license examination or change their policy on interpretation. Left with no clear alternative, Plaintiffs filed this suit.

68.     Defendants have no legitimate reasons for their injurious English-only policy. Defendants have changed their purported justification of their policy from the "unavailability" of translations.  They now attempt to justify their policy by claiming it is unsafe for people who cannot read English to drive in Hawai`i.  Yet Defendants' own policies allow illiterate persons to take an oral driver's license exam, and non-English speaking people are allowed to drive using a foreign driver's license for a period of one year before they are required to obtain a Hawai`i license.

69.     On information and belief, Defendants justifications of their English-only policy are mere pretext for their preference of U.S. citizens over non-citizens.  Defendants updated the English test so that U.S. citizens could obtain a license, but they have refused to update the non-English tests and add new translations without any legitimate reason for doing so and in spite of the availability of free or low-cost resources that could be used to make a driver's license accessible for non-U.S. citizens.

70.     Defendants know or have been provided with information clearly demonstrating that there is a great need for translation and interpretation of the driver's license exam. Defendants know or should know that their English-only policy disproportionately adversely affects people of national origins other than the United States. Having no legitimate reason for their English-only policy, Defendants have intentionally adopted and maintained a policy that they know has severe adverse effects on persons of national origin other than the United States.

**Defendants' Failure to Provide Translations of the Driver's Exam has Caused Plaintiffs and the Members of the Class Significant Harm**

71.     The lack of a driver's license limits access to employment, school, medical services, cultural and church activities, and even learning English.

72.     Especially in Hawai`i, where the public transportation system does not always offer full or consistent service, driving is vital.

21

73.     HDOT's refusal to provide translations of the exams also creates significant hidden costs to the counties.  Because of necessity, for example driving to and from work, a growing number of people are driving without a license or insurance. This creates a risk to public safety and drains judiciary and police resources.

74.     With the possible exception of Laotian, there are over 1,000 people in Hawai`i from each language group for which FACE has requested translations who have limited English proficiency and who need driver's license testing in their native languages.

75.     The inability to obtain a driver's license seriously hinders the opportunities available to individuals who belong to FACE's member organizations and to the general population of LEP persons.

76.     Many of the people FACE works with and for, and who help FACE carry out its work, are unable to get a driver's license because their difficulty communicating in English prevents them from passing the driver's exam, which is now only offered in English.  The inability of LEP persons to obtain driver's licenses presents a significant problem for FACE because it makes it more difficult, and at times impossible, for such individuals to travel to FACE activities and meetings and ultimately frustrates FACE's ability to obtain the reforms it seeks.

77.    A major component of FACE's work is training the individuals within the groups they are seeking to assist how to advocate for themselves.  When people miss a FACE meeting, they miss opportunities to vote on or otherwise influence FACE's work, and they miss the valuable training on how to advocate for themselves, which fundamentally interferes with FACE's mission.

78.    FACE has accrued significant expense in its efforts to get Defendants to comply with the law, and estimates that it has spent in excess of $60,000 attempting to get Defendants to change their English-only policy. .

79.    Both before language assistance was provided for the driver's license examination and after Defendants' withdrawal of the FACE-facilitated translated driver's license exam materials, FACE diverted resources and/or spent additional resources to ensure LEP Persons' participation in its activities.  For example, FACE staff members spend time and resources to arrange for or provide rides and car pools in order that individuals can attend FACE meetings and events. This requires FACE to expend precious staff time and resources that would otherwise be devoted to advocacy efforts.  Sometimes, FACE staff members receive telephone calls from individuals who cannot attend meetings (because they cannot drive and/or car pool arrangements fall through), and personally pick up people from their homes to drive them to FACE events and meetings because of

those individuals' inability to pass a driver's license exam because it is only offered in English.

80.     These individuals do not have viable alternatives for getting to FACE meetings and would not be able to attend if FACE did not provide rides.  As it is, people who get rides from FACE staff do so at a serious sacrifice of their time. FACE staff often have to pick up the individuals long before the meeting starts so that the staff member will be at the meeting site with sufficient time to set up, and then the individuals will need to wait around until staff are done cleaning up from the event, which often adds an extra two hours of waiting for the individuals that get rides.

81.     FACE estimates that it has expended around $4,500 in staff time and resources during the past two years for what essentially amounts to taxi service for members of the putative class who could not otherwise attend FACE activities because of Defendants' English-only policy and the resulting inability of the putative class members to obtain a license.  FACE spends its resources to get these people to its activities because their absence would frustrate FACE's mission and interfere with FACE's ability to accomplish its goals.  Their attendance is necessary in order for FACE to accomplish its work.  If language assistance were offered for the driver's license exam, these individuals would pass the driver's

exam, obtain a driver's license, and drive themselves to FACE meetings and events, saving themselves considerable time and saving FACE considerable expense.

82.    Further, FACE's efficacy in achieving its goals has been curtailed because putative class members have not been able to attend FACE activities even though they would but for Defendants' English-only policy and the resulting inability of the members to obtain driver's licenses and drive to FACE meetings.  FACE estimates its damages as approximately $30,000 as a result of lost efficacy from members not being able to attend FACE activities.

83.    Defendants' actions have inflicted even greater harms on Plaintiff Kovac and the class of persons whom he seeks to represent.

84.    Plaintiff Tochiro Kochiro Kovac resides on Maui, where bus service is limited and irregular.  He lives in Wailuku and works in Lahaina.  In order to get to Lahaina in time to start work at 10 a.m., Mr. Kovac leaves his home at 6:30 in the morning and takes a series of buses.  Once he finishes work at 6:00 p.m., Mr. Kovac takes a series of buses back to Wailuku, arriving at home around 8:30 in the evening.  He spends approximately 5 hours each day on the bus to and from work.  If he were able to take the driver's license examination in his native Chuukese, he would pass, obtain a driver's license, and drive to work so that his entire commute would be about an hour.

85.     Mr. Kovac is a good driver and has never been in a car accident. However, despite his attempts to study the Official Drivers Manual, Mr. Kovac is unable to understand many of the questions on the written exam and, as a result, does not have a driver's license.

86.     Other members of the Plaintiff class are suffering significant irreparable harm, including the following:

a.     They are disadvantaged at finding employment and at work once they do find employment.  They may be turned down because of their lack of driver's license, or be forced to drive without a license to get to work or to perform their duties while at work.

b.     They suffer from disadvantages, such as the inability to build credit despite timely payments and honest work, the inability to spend quality time with family and growing children, and the inability to increase their opportunities for self-sufficiency.  They may even find themselves at risk during medical emergencies.

c.     They are insulted and degraded when they visit drivers licensing offices to seek a license, for example, one member of the Plaintiff class was denied the use of a court-certified interpreter he provided and was told he needed to take the test in English to confirm he could understand what a stop sign said.

889272v1

d. Some members of the Plaintiff class drive without a license out of necessity, to get to work to support their families or in cases of medical emergency. By doing, they have been subjected to citations, hefty fines, and even misinformed threats of deportation.

87. All injuries mentioned above are inflicted upon the Plaintiff class because of their limited English proficiency on account of their national origin.

## FIRST CLAIM FOR RELIEF:
## VIOLATION OF EQUAL PROTECTION UNDER THE
## FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983

88. Plaintiffs reallege and incorporate by reference each and every allegation contained in the above paragraphs.

89. Plaintiffs are entitled to the equal protection of the laws under the Fourteenth Amendment of the Constitution of the United States.

90. Defendants refuse to offer language assistance to LEP persons because of their national origins, despite being informed of and knowing that their refusal has an adverse impact on the people of a protected class and having no legitimate reason to cause such impact.

91. Defendants' conduct constitutes intentional discrimination and violates Plaintiffs' Constitutional right to equal protection under the Fourteenth Amendment.

889272v1

92.     Plaintiffs have suffered and will continue to suffer irreparable harm from the lack of language access to the written driver's license exam for no reason other than their limited English proficiency on account of their national origin.

93.     As a result of these violations, Plaintiffs are entitled to declaratory and injunctive relief.

## SECOND CLAIM FOR RELIEF:
## VIOLATION OF SECTION 601 OF TITLE VI OF THE
## CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000d.

94.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the above paragraphs.

95.     Defendants refuse to offer language assistance to LEP persons because of their national origins, despite being informed of and knowing that their refusal has an adverse impact on the people of a protected class and having no legitimate reason to cause such impact.

96.     Defendants are recipients of federal funds.

97.     Defendants' conduct constitutes intentional discrimination, a violation of Plaintiffs' civil rights under Title VI of the Civil Rights Act of 1964.

98.     Plaintiffs have suffered and will continue to suffer irreparable harm from the lack of language access to the written driver's license exam for no

reason other than their limited English proficiency on account of their national origin.

99.    As a result of these violations, Plaintiffs are entitled to declaratory and injunctive relief and damages.

## DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS

100.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the above paragraphs.

101.    An actual and immediate controversy has arisen and now exists between Plaintiffs and Defendants, which parties have genuine and opposing interests and which interests are direct and substantial.  Defendants have failed and continue to fail to comply with the provisions of the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964 for at least the reasons set forth herein.

102.    Plaintiffs have no adequate remedy at law.  Unless enjoined by the Court, Defendants will continue to infringe Plaintiffs' statutorily and constitutionally protected rights and will continue to inflict irreparable injury.  This threat of injury to Plaintiffs from continuing violations requires preliminary and permanent injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all persons similarly situated, respectfully request that this Court:

a.    Assume jurisdiction over this action;

b.    Issue a declaratory judgment stating that Defendants have violated the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964;

c.    Grant all injunctive relief necessary to bring Defendants into compliance with the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964;

d.    Grant such other declaratory and injunctive relief as may be appropriate;

e.    Order Defendants to pay compensatory damages to compensate for the harm caused by the Defendants' intentional discrimination, as may be justified by the evidence at trial;

f.    Award Plaintiffs reasonable attorney's fees, and other costs of the action pursuant to 42 U.S.C. §1988 and other applicable laws; and

g.    Order such other relief as the court may deem just and proper.

889272v1

DATED:  Honolulu, Hawai`i, February 11, 2014.

/s/ Lucas J. Myers
PAUL ALSTON
J. BLAINE ROGERS
CLAIRE WONG BLACK
LUCAS J. MYERS
VICTOR GEMINIANI
GAVIN THORNTON

Attorneys for Plaintiffs

31