IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| FAITH ACTION FOR COMMUNITY EQUITY; TOCHIRO KOCHIRO KOVAC, individually and on behalf of a class of persons in the State of Hawaii who, because of their national origins, have limited English proficiency<br><br>        Plaintiff,<br><br>    vs.<br><br>STATE OF HAWAII; HAWAII DEPARTMENT OF TRANSPORTATION; GLENN OKIMOTO, in his official capacity as the Director of the Hawaii Department of Transport,<br><br>        Defendants.<br>_____ | CIVIL NO. 13-00450 SOM/RLP<br><br>ORDER DENYING MOTION TO DISMISS ORGANIZATIONAL PLAINTIFF FOR LACK OF STANDING AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM |

**ORDER DENYING MOTION TO DISMISS**
**ORGANIZATIONAL PLAINTIFF FOR LACK OF STANDING**
**AND MOTION TO DISMISS COMPLAINT FOR FAILURE TO STATE A CLAIM**

I.        INTRODUCTION.

        Plaintiffs Faith Action for Community Equity ("FACE")
and Tochiro Kochiro Kovac bring this putative class action
against the State of Hawaii, the Hawaii Department of
Transportation ("HDOT"), and its Director, Glenn Okimoto.  FACE
and Kovac allege that HDOT's policy of offering the state
driver's examination in English only is the product of
intentional discrimination, and therefore violates the Fourteenth
Amendment's guarantee of equal protection and Title VI's

prohibition against disparate treatment in federally funded programs.

Before the court are two motions to dismiss filed by Defendants: the first motion seeks dismissal of FACE on the ground that it does not have Article III standing to bring this action, and the second motion seeks dismissal of the First Amended Complaint on the ground that Plaintiffs fail to state a claim. Defendants also argue that Plaintiffs' claim for injunctive relief is moot because HDOT now offers the written portion of the driver's exam in multiple languages.

The court denies both the motion to dismiss for lack of standing and the motion based on a failure to state a claim. The court also concludes that Defendants' voluntary cessation of the English-only policy does not render moot Plaintiffs' claim for injunctive relief.

II.     **BACKGROUND.**

Between 2001 and 2009, HDOT allegedly provided translations of the written portion of the state's driver's license exam in eight languages: Japanese, Mandarin, Korean, Samoan, Tagalog, Vietnamese, Laotian, and Tongan. First Amended Complaint ¶ 39, ECF No. 60. Plaintiffs allege that, in 2009, HDOT "pulled the plug" on translations when it added a single question to the exam. Id. ¶ 45. HDOT also allegedly refuses to allow interpretation for the road portion of the exam, even when

"applicants offer to supply their own interpreters so that it would cost HDOT nothing." Id. ¶ 46.

Plaintiffs state that, since the introduction of the English-only policy, many individuals with low English proficiency ("LEP"), "the vast majority of whom are people of nationalities other than the U.S., have been unable to pass the test and obtain a driver's license." Id. ¶ 47. On March 17, 2014, after the filing of the First Amended Complaint, HDOT began to once again offer translations for the written portion of the exam, this time in 12 languages. See Defendant's Memo. Re Standing in Light of Intervening Events, ECF No. 75. Nothing in the record suggests that HDOT now offers or allows translations for the road test portion of the exam.

Plaintiffs allege that, before March 17, 2014, Defendants "intentionally adopted and maintained a policy that they kn[ew] ha[d] severe [and disproportionate] adverse effects on persons of national origin other than the United States." FAC ¶ 70. Plaintiffs claim that Defendants "kn[ew] or ha[d] been provided with information clearly demonstrating that there [was] a great need for translation and interpretation of the driver's license exam." Id. ¶ 70.

Plaintiffs believe that Defendants' cost and safety justifications for the English-only policy "are mere pretext for their preference of U.S. citizens over non-citizens" and over

"people of national origins other than the United States." Id. ¶¶ 69-70. Plaintiffs claim that the cost of translation would be "significantly less than $2000," which is "nominal" when compared to HDOT's annual budget "exceed[ing] $1 billion." Id. ¶ 45. Plaintiffs say that HDOT's alleged safety rationale is similarly not worthy of credence because HDOT's "policies allow illiterate persons to take an oral driver's license exam, and non-English speaking people are allowed to drive using a foreign driver's license for a period of one year before they are required to obtain a Hawaii license." Id. ¶ 68.

FACE is a "faith-based grassroots non-profit organization" whose mission is "to engage[] in actions that challenge[] the systems that perpetuate poverty and injustice." Id. ¶ 12. Plaintiffs describe FACE's work as "conduct[ing] social, economic and community activities, and provid[ing] leadership development though meetings and workshops." Id. One of FACE's "primary areas of advocacy involves addressing and remedying problems faced by recent immigrants to Hawaii." Id. ¶ 13. Plaintiffs claim that one of the ways "FACE accomplishes [this] work is through meetings and workshops with the individual members of its member institutions." Id. ¶ 12. Plaintiffs also claim that these meetings and workshops are used to help "train[] [new immigrants] to advocate for themselves." Id. ¶ 77.

Plaintiffs allege that "FACE and its members have devoted substantial resources to addressing th[e] licensing issue and advocating for the rights of LEP people." Id. ¶ 13. They allege that the provision of multilingual driver's tests between 2001 and 2009 was in part the product of FACE's "considerable advocacy effort." Id. ¶ 39. Plaintiffs claim that FACE renewed its advocacy in 2013, when it learned of the English-only policy. After allegedly being rebuffed several times, FACE was able to meet with HDOT officials on May 15, 2013. Plaintiffs say that, during the meeting, "HDOT officials acted disinterested and even hostile." Id. ¶ 60. Plaintiffs claim that "[t]he HDOT official who FACE was told was ultimately responsible for making the determination regarding translations and interpretation never answered a single question that the Chuukese and Marshallese members of FACE's delegation asked of him, though he did respond to questions posed by others." Id. ¶ 62. Plaintiffs further allege that "HDOT's acting director for civil rights expressed surprise that there were Marshallese and Chuukese people living on all the islands and asked why Marshallese and Chuukese people had moved to Hawaii." Id. ¶ 63. In response to the allegedly "humiliat[ing]" way in which HDOT officials were treating FACE's delegation, a Micronesian member of FACE's delegation "began tearing up." Id. ¶ 64. FACE allegedly "decided to end the meeting early to avoid further humiliation." Id.

In addition to the resources spent advocating against the English-only policy, FACE has allegedly spent "around $4,500 in staff time and resources during the past two years [on an informal] taxi service for [LEP individuals] who could not otherwise attend FACE activities." Id. ¶ 81. Plaintiffs allege that the attendance of these individuals at FACE's meetings and workshops is "necessary in order for FACE to accomplish its work." Id. FACE claims that it has spent $60,000 in direct advocacy to persuade HDOT to alter the English-only policy, and has suffered an additional "$30,000 [in damages] as a result of lost efficacy from members not being able to attend FACE activities," notwithstanding FACE's "taxi-service." Id. ¶ 82.

The other named Plaintiff in this case is Tochiro Kochiro Kovac. Kovac is Chuukese and resides on Maui. Id. ¶ 84 "He spends approximately 5 hours each day on the bus to and from work," because bus service on Maui is "limited and irregular." Id. ¶ 84. Even though Kovac is allegedly a "good driver," he has been unable to understand many of the questions on the written exam and, as a result, does not have a driver's license." Id. ¶ 85.

III.     **LEGAL STANDARDS.**

**A.     Rule 12(b)(1).**

"Rule 12(b)(1) jurisdictional attacks can be either facial or factual." White v. Lee, 227 F.3d 1214, 1242 (9th Cir.

2000). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004).

When the challenge is facial, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Fed'n of African Amer. Contractors v. City of Oakland, 96 F.3d 1204, 1207 (9th Cir. 1996). In a facial attack on jurisdiction, the court "confin[es] the inquiry to allegations in the complaint." Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty., 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).

In a factual attack on jurisdiction, however, a court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." Wood v. City of San Diego, 678 F.3d 1075, 1083 n.8 (9th Cir. 2012) (internal quotation omitted). In such a challenge, "[t]he court need not presume the truthfulness of the plaintiff's allegations." Id. "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party

opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." Savage, 343 F.3d at 1039 n.2.

**B.   Rule 12(b)(6).**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, review is generally limited to the contents of a complaint. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Campanelli v. Bockrath, 100 F.3d 1476, 1479 (9th Cir. 1996). If matters outside the pleadings are considered, the Rule 12(b)(6) motion is treated as one for summary judgment. See Keams v. Tempe Tech. Inst., Inc., 110 F.3d 44, 46 (9th Cir. 1997); Anderson v. Angelone, 86 F.3d 932, 934 (9th Cir. 1996). However, courts may "consider certain materials--documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice--without converting the motion to dismiss into a motion for summary judgment." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). Documents whose contents are alleged in a complaint and whose authenticity is not questioned by any party may also be considered in ruling on a Rule 12(b)(6) motion to dismiss. See Branch v. Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994).

On a Rule 12(b)(6) motion, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Fed'n of African Am. Contractors v. City

of Oakland, 96 F.3d 1204, 1207 (9th Cir. 1996).  However,
conclusory allegations of law, unwarranted deductions of fact,
and unreasonable inferences are insufficient to defeat a motion
to dismiss.  Sprewell, 266 F.3d at 988; In re Syntex Corp. Sec.
Litig., 95 F.3d 922, 926 (9th Cir. 1996).  The court need not
accept as true allegations that contradict matters properly
subject to judicial notice or allegations contradicting the
exhibits attached to the complaint.  Sprewell, 266 F.3d at 988.

Dismissal under Rule 12(b)(6) may be based on either:
(1) lack of a cognizable legal theory, or (2) insufficient facts
under a cognizable legal theory.  Balistreri v. Pacifica Police
Dept., 901 F.2d 696, 699 (9th Cir. 1988) (citing Robertson v.
Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir.
1984)).

"[T]o survive a Rule 12(b)(6) motion to dismiss,
factual allegations must be enough to raise a right to relief
above the speculative level, on the assumption that all the
allegations in the complaint are true even if doubtful in fact."
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)) (internal
quotation marks omitted); accord Ashcroft v. Iqbal, 556 U.S. 662,
678 (2009) ("the pleading standard Rule 8 announces does not
require 'detailed factual allegations,' but it demands more than
an unadorned, the-defendant-unlawfully-harmed-me accusation").
"While a complaint attacked by a Rule 12(b)(6) motion to dismiss

does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. The complaint must "state a claim to relief that is plausible on its face." Id. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 677.

## IV. ANALYSIS.

### A. FACE's Standing.

An organizational plaintiff may assert standing as a representative of its members, or first-party standing in its own right as an independently injured entity. See Smith v. Pac. Properties & Dev. Corp., 358 F.3d 1097, 1101 (9th Cir. 2004). FACE explicitly disclaims any reliance on the doctrine of representative standing, and instead claims standing only in its own right.

"In determining whether [an organiztion] has standing [in its own right] . . . [a court must] conduct the same inquiry as in the case of an individual: Has the plaintiff alleged such a personal stake in the outcome of the controversy as to warrant

his invocation of federal-court jurisdiction?" <u>Havens Realty</u>

<u>Corp. v. Coleman</u>, 455 U.S. 363, 378-79 (1982).

In other words, FACE must meet the ordinary individual

requirements of Article III standing, which involve showing that

it has suffered:

> "an injury in fact," i.e., "an invasion of a
> legally protected interest which is (a)
> concrete and particularized, and (b) actual
> or imminent, not conjectural or
> hypothetical." . . . Second, it must show
> that the injury is "fairly traceable to the
> challenged action of the defendant," and is
> not "the result of the independent action of
> some third party not before the court." . . .
> Finally, "it must be likely, as opposed to
> merely speculative, that the injury will be
> redressed by a favorable decision."

<u>Ass'n of Pub. Agency Customers v. Bonneville Power Admin.</u>, 733

F.3d 939, 950 (9th Cir. 2013) (<u>quoting</u> <u>Lujan v. Defenders of</u>

<u>Wildlife</u>, 504 U.S. 555, 560-61 (1992)

In the Ninth Circuit, "an organization may satisfy the

Article III requirement of injury in fact if it can demonstrate:

(1) frustration of its organizational mission; and (2) diversion

of its resources to combat the particular [] discrimination in

question." <u>Smith v. Pac. Props & Dev. Corp.</u>, 358 F.3d at 1105.

However, the "organizational mission" cannot simply be opposing a

law through litigation, and the "diversion of resources" cannot

be the consequent litigation costs. <u>See</u> <u>Fair Hous. Council of</u>

<u>San Fernando Valley v. Roommate.com, LLC</u>, 666 F.3d 1216, 1219

(9th Cir. 2012) ("An organization cannot manufacture an injury by

incurring litigation costs or simply choosing to spend money
fixing a problem that otherwise would not affect the organization
at all.").

### 1. Standing based on the resources FACE has spent on advocating against the English-only policy.

FACE appears to suggest that HDOT's policy frustrates
its "organizational mission" of "engaging in actions that
challenge the systems that perpetuate poverty and injustice,"
and argues that it has had to devote significant resources to
advocating against the English-only policy outside of this
litigation.  Presumably, however, a plaintiff in any civil rights
suit is challenging what it perceives to be "a system of
injustice."  An organization's injury must be "concrete and
demonstrable . . . [not] simply a setback to the organization's
abstract social interests."  <u>Havens Realty Corp.</u>, 455 U.S. at
379.

FACE has alleged a lengthy history of opposition to
HDOT's policy, and claims to have been advocating for a
multilingual exam since at least 2001.  But a workable test for
Article III standing cannot hinge on the amount of prelitigation
advocacy against a particular policy that an organization engages
in.  To establish first-party standing, the organization cannot
merely disapprove of a law, it must be injured by it.  And the
injury in question cannot be the voluntarily incurred cost of

trying to have the law changed; the organization must be independently harmed by the law's operation. <u>See</u> <u>La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest</u>, 624 F.3d 1083, 1088 (9th Cir. 2010) (noting that the organization must show it would "have suffered some other injury if it had not diverted resources to counteracting the problem.").

Even the Ninth Circuit's highly permissive requirements for organizational standing plainly recognize that the challenged law must "affect the organization" beyond mere ideological opposition and nonlitigation attempts to get the law changed.

In <u>Smith</u>, for example, the question at issue concerned the standing of a nonprofit corporation "organized with the principal purpose of helping to eliminate discrimination against individuals with disabilities by ensuring compliance with laws intended to provide access . . . to services." 358 F.3d at 1105. The organization brought a claim under the Fair Housing Act against a real-estate developer whose buildings allegedly contained "discriminatory design and construction defects." <u>Id.</u> at 1099. The organization claimed an independent interest in "ensuring an adequate stock of accessible housing for those who are freed to leave the nursing homes." <u>Id.</u> at 1105. The defendants' challenged action was allegedly injurious to this independent interest. Whether or not the corporation chose to advocate or litigate against it, the corporation in <u>Smith</u> would

have been harmed by the defendant's practice because it lessened the availability of housing stock the corporation could place members of the disabled community in. Here, by contrast, the only interest that FACE alleges is opposing the law itself. The law only affects FACE to the extent that FACE voluntarily chooses to advocate against it.

In Roommate, the plaintiff fair housing councils "started new education and outreach campaigns targeted at discriminatory roommate advertising" in response to discovering that the defendant website was "steering and matching its users" based on characteristics such as "sex, sexual orientation and familial status." 666 F.3d at 1219. "The resources spent on these campaigns were not associated with litigation." Id. Roommate takes Smith one step further by allowing an organization to count expenditures that are *responsive* to the practice it challenges in litigation to constitute the relevant Article III injury. However, the expenditures in Roommate were collateral to the effort to change the challenged policy. If the fair housing councils' expenditures had not been on "education and outreach campaigns" targeted at third parties, but rather on letters sent to the defendant itself demanding that the policy be changed, it is unlikely the Ninth Circuit would have found that the councils had met the requirements of Article III standing.

Moreover, fair housing councils seek to eliminate discrimination in the allocation of housing. This organizational interest is broader than simply advocating against any particular challenged conduct, but narrower than fighting "the structures that perpetuate injustice." FACE's problem is that its alleged organizational mission is either too narrow or too broad to coherently support Article III standing. Granting FACE standing either because its mission is to oppose a single policy or to oppose injustice generally would strip all meaning from the "organizational mission" prong of the Smith test.

In short, under Plaintiffs' theory, any organization could perform an end run around Article III by artfully defining its organizational purpose and engaging in perfunctory advocacy efforts before filing a complaint. This would have the consequence of routinely allowing organizations with no "personal stake in the outcome of [a] controversy" to file complaints, thereby depriving courts of "the concrete adverseness [that] sharpens the presentation of issues." Warth v. Seldin, 422 U.S. 490, 525 (1975).

### 2. Standing based on the resources FACE has spent "taxiing" its members.

While this court is not persuaded that FACE's advocacy expenses provide organizational standing, that is not the only ground on which FACE claims to have standing. FACE also alleges that it has spent considerable resources providing an "informal

15

taxi service" for individuals to attend FACE meetings and
workshops.

Assuming that offering workshops and organizing
meetings is an important part of FACE's "organizational mission,"
and assuming many participants in such events are LEP individuals
unable to drive because of the English-only policy, the court
concludes that Plaintiffs have sufficiently alleged that FACE has
suffered an injury-in-fact.  If FACE had not diverted resources
to combating the English-only policy, it would allegedly have
suffered independent injury.

Defendants might, following discovery, be able to
present evidence demonstrating that these workshops do not
require the participation of individuals affected by the
English-only policy, that the workshops are not part of FACE's
primary work, or that no resources have been diverted from other
areas to provide the "taxi-service."  However, at this stage, the
allegations in the Complaint suffice to preclude dismissal on
standing grounds.  Lujan, 504 U.S. at 561 ("At the pleading
stage, general factual allegations of injury resulting from the
defendant's conduct may suffice.").

The allegations in the First Amended Complaint are also
sufficient to establish that FACE's injury is "fairly traceable
to the [English-only policy] and that [it] is . . . likely to be
redressed by the requested relief."  Lujan, 504 U.S. at 590.

16

FACE alleges that, but for the English-only policy, various LEP individuals would "obtain a driver's license, and drive themselves to FACE meetings and events, saving themselves considerable time and saving FACE considerable expense." FAC ¶ 81. That allegation is sufficient to meet Lujan's causation and redressability prongs at the pleading stage.

Defendants challenge, as a factual matter, whether FACE has diverted resources as a result of the English-only policy and whether it is important to FACE's organizational mission to conduct such meetings and workshops. Defendants note that, because FACE is composed of organizations, not individuals, it does not matter whether particular individuals can attend the meetings, so long as FACE has a sampling of the views of each "member organization." While the manner in which FACE functions could be more clearly delineated, Defendants' argument appears to depend largely on matters outside the record. Of course, in a 12(b)(1) factual challenge, matters outside a complaint may be considered, but the sole document Defendants rely on is FACE's 2011 Form 990 filing. This filing does not list any enumerated amount for "taxi service." Defendants therefore argue that the amount FACE spends on its advocacy work is unaffected by the English-only policy. But this document alone demonstrates little. It is unsurprising that an "informal taxi service" does not appear individually specified in a federal tax filing and it

is impossible to deduce from a single year's data the effect on FACE's work that the English-only policy may have had.

FACE offers a declaration from Kim Harman, FACE's Director of Policy & Development, who states that she and other FACE staffers have personally taxied individuals to meetings and workshops. The Form 990 filing and the Harman declaration are the only two items of evidence in the record relevant to the taxi issue. These two documents do not support the Rule 12(b)(1) factual attack.

Finally, Defendants suggest that the absence of individual members from FACE meetings constitutes, at most, a *de minimis* injury. See <u>Skaff v. Meridien N. Am. Beverly Hills, LLC</u>, 506 F.3d 832, 840 (9th Cir. 2007) (noting that some injuries are "too trifling . . . to support constitutional standing"). However, the First Amended Complaint sufficiently alleges the significance of the injury FACE has suffered. <u>See, e.g.</u>, FAC ¶ 81 (noting that attendance of individuals who are unable to drive themselves is "necessary for FACE to accomplish its work" and that FACE has spent "around $4500 in staff time and resources during the past two years" on taxiing individuals). Defendants provide no evidence contradicting the allegations in Plaintiffs' pleadings regarding the severity of injury. At this stage of the litigation, the court is not persuaded by the Rule 12(b)(1) factual challenge.

## B. Mootness.

Defendants contend that their recent implementation of a decision to offer the written exam in 13 languages renders moot Plaintiffs' claims for injunctive relief.  Plaintiff Kovac indisputably presents a live claim for damages, which precludes dismissal of the damage portion of the case for mootness. Bernhardt v. Cnty. of Los Angeles, 279 F.3d 862, 872 (9th Cir. 2002).

Plaintiffs argue that even the claim for injunctive relief is not moot because this case falls within the "voluntary cessation" exception to the mootness doctrine, and because Defendants are not offering the road test portion of the driver's exam with interpretation services.

"[A] suit becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  Chafin v. Chafin, 133 S. Ct. 1017, 1023 (2013).  This occurs "only when it is impossible for a court to grant [] effectual relief [] to the prevailing party."  Id. However, "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 174 (2000).  In such a situation, "dismissal for mootness would permit a resumption of the challenged conduct as

soon as the case is dismissed." Knox v. Serv. Emp. Int'l Union, Local 1000, 132 S. Ct. 2277, 2287 (2012).

Therefore, "when a party abandons a challenged practice freely, the case will be moot only if subsequent events ma[ke] it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." United States v. Brandau, 578 F.3d 1064, 1068 (9th Cir. 2009) (internal quotation omitted) (emphasis in original). "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." Laidlaw, 528 U.S. at 189.

Defendants point to an internal memorandum written by HDOT's Office of Civil Rights before this litigation began. That document recommends that the driver's exam be provided in multiple languages to bring Hawaii into compliance with section 602 of Title VI. The document suggests that the State may have acted in good faith in altering its policy. But the presumption of good faith already attaches to governmental policy changes. Am. Cargo Transp., Inc. v. United States, 625 F.3d 1176, 1180 (9th Cir. 2010). Acting in good faith does not diminish Defendants' heavy burden of showing that the "challenged conduct cannot reasonably be expected to start up again." Rosebrock v. Mathis, 2014 WL 982897, at *5 (9th Cir. Mar. 14, 2014). "[E]ven if the government is unlikely to reenact the provision, a case is

not easily mooted where the government is otherwise unconstrained should it later desire to reenact the provision." <u>Coral Const. Co. v. King Cnty.</u>, 941 F.2d 910, 928 (9th Cir. 1991).

HDOT's translation policy has changed multiple times in recent years for reasons "not reflected in statutory changes or even in changes in ordinances or regulations." <u>Rosebrock</u>, 2014 WL 982897, at *6. There appears to be nothing at all constraining HDOT from reversing course once again in the future and removing the translations. Therefore, Defendants cannot be said to have met their heavy burden of showing that the test will continue to be offered in multiple languages. An injunction by this court would still constitute effectual relief for Plaintiffs, by preventing Defendants from altering their policy in the future. Plaintiffs' claim for injunctive relief is therefore not moot even with respect to the written portion of the exam.[1]

### C.  Motion to Dismiss for Failure to State a Claim.

Plaintiffs bring claims under the Equal Protection Clause and section 601 of Title VI. "[V]iolations of equal protection and Title VI require similar proofs—plaintiffs must show that actions of the defendants had a discriminatory impact,

---

[1] Given the court's decision that the voluntary cessation doctrine applies, it is unnecessary for the court to address Plaintiffs' further argument that the case remains "live" given the road test portion of the exam.

*and* that defendants acted with an intent or purpose to discriminate based upon plaintiffs' membership in a protected class." <u>The Comm. Concerning Cmty. Improvement v. City of Modesto</u>, 583 F.3d 690, 702-03 (9th Cir. 2009) (emphasis added). There is no cause of action for disparate impact under either the Equal Protection Clause or Title VI. <u>See</u> <u>Washington v. Davis</u>, 426 U.S. 229, 239 (1976)(holding that government action is not "unconstitutional solely because it has a racially disproportionate impact"); <u>see also</u> <u>Alexander v. Sandoval</u>, 532 U.S. 275, 280 (2001) (noting that "it is beyond dispute . . . that § 601 [of Title VI] prohibits only intentional discrimination").

Intentional discrimination "implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." <u>Pers. Adm'r of Mass. v. Feeney</u>, 442 U.S. 256, 279 (1979) (internal quotation omitted).

Defendants' focus is on their contention that, "[a]s long as a public entity's policy or practice distinguishes among people for reasons other than race, ethnicity, national origin, or gender and does not burden the enjoyment of a fundamental right, it will be upheld against an equal protection challenge if

it is rationally related to a legitimate governmental interest."
Def. MTD at 9-10, ECF 62-1.  To the extent this contention
assumes that only *express* classifications are subject to an equal
protection challenge, and that any facially neutral law is
subject only to rational basis review, that is not the law.

Intentional discrimination can occur in three separate
ways: (1) a law or policy may explicitly classify citizens on the
basis of a protected category, see, e.g., Hunter v. Erickson, 393
U.S. 385 (1969); (2) a facially neutral law or policy may be
applied differently on the basis of membership in a protected
category, see, e.g., Wayte v. United States, 470 U.S. 598 (1985);
or (3) a facially neutral law or policy may be applied
evenhandedly but motivated by discriminatory intent.  See, e.g.,
Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S.
252, 265 (1977).

Plaintiffs themselves repeatedly characterize the
English-only policy as "facially neutral."  The court infers from
this that Plaintiffs are not arguing that LEP individuals are
themselves a protected class, or that this is a case of "proxy
discrimination."  See Pac. Shores Prop., LLC v. City of Newport
Beach, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013) ("Proxy
discrimination is a form of facial discrimination . . .
[involving] a law or policy that treats individuals differently
on the basis of seemingly neutral criteria that are so closely

associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group."). But see Olaques v. Russoniello, 797 F.2d 1511, 1521 (9th Cir. 1986), vacated on other grounds, 484 U.S. 806 (1987) (noting that ordinarily "a non-English-speaking classification is facially neutral with respect to ethnic [or national origin] group classification").

Nor do Plaintiffs allege that the English-only policy has been applied differently on the basis of membership in a protected class.[2]

Plaintiffs instead allege the third type of discrimination: that the facially neutral English-only policy was motivated in part by an animus against people from national origins where English is not a primary language.[3]

Defendants argue at length that LEP status is not a suspect class. That analysis fails to address the gravamen of

_____

[2] This would be the case if, for example, individuals from nations where English was a primary language but whose English was nonetheless inadequate to pass the exam were given preferential treatment by test examiners, as compared with individuals from nations where English was not a primary language.

[3] The First Amended Complaint also at times makes reference to discrimination on the basis of alienage. In their briefing, however, Plaintiffs only discuss discrimination based on national origin. The court's order today does not, however, foreclose Plaintiffs from later arguing that HDOT has a discriminatory animus against noncitizens, if they are able to discover evidence supporting such an argument. See Graham v. Richardson, 403 U.S. 365, 376 (1971) (applying Equal Protection Clause to discrimination based on alienage).

Plaintiffs' claims. Plaintiffs are not arguing that any law that classifies individuals based on LEP status must survive strict scrutiny. Instead, Plaintiffs appear to be arguing that the English-only policy is motivated by a discriminatory animus against individuals from nations where English is not a primary language.[4]

Plaintiffs cannot prevail in this case by simply showing that the English-only policy disproportionately harms LEP individuals, or that Hawaii officials have an animus against LEP individuals for reasons unrelated to membership in a protected class. For example, even if Plaintiffs could show that the English-only policy was created in part because officials dislike having people in Hawaii who do not speak English, that alone would not suffice to prevail on the merits. Of course "language is close[ly related to] national origin [and] restrictions on the use of languages may mask discrimination against specific national origin groups or, more generally, conceal nativist sentiment." Yniguez v. Arizonans for Official English, 69 F.3d 920, 947-48 (9th Cir. 1995), judgment vacated on other grounds by Arizonans for Official English v. Arizona, 520 U.S. 43 (1997). Still, Plaintiffs would ultimately have to demonstrate that

_____

[4] For this reason, Defendants' reliance on Carmona v. Sheffield, 475 F.2d 738, 739 (9th Cir. 1973), which does not appear to involve an allegation of discriminatory animus, is misplaced.

animus against LEP individuals, or any particular linguistic group, reflects an underlying animus based on national origin.

To survive the present motion to dismiss, Plaintiffs must have pled facts making their claim of intentional discrimination plausible. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. The relevant inquiry, therefore, is whether or not the English-only policy was motivated by a discriminatory reason. Id. A bare allegation of discriminatory animus is not a "fact" entitled to the presumption of truth. See Iqbal, 556 U.S. at 681 (stating that the allegation "that [the Government] adopted a policy 'because of, not merely in spite of, its adverse effects upon an identifiable group' . . . [is] conclusory and not entitled to be assumed true") (internal citation omitted). Plaintiffs must allege sufficient specific facts from which a conclusion of discriminatory animus can be plausibly drawn. If this case proceeds to the summary judgment stage, "[d]etermining whether invidious discriminatory purpose was a motivating factor [will] demand[] a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429 U.S. at 266. While this sensitive inquiry can only occur based on evidence presented after discovery, Plaintiffs at the motion

to dismiss stage must have alleged sufficient specific facts to make their entitlement to relief at least plausible.  See Iqbal, 556 U.S. at 678.

The First Amended Complaint alleges three sets of facts that, if true, could lead to the reasonable inference that Defendants acted with discriminatory animus against individuals originating from nations where English is not the primary language.

First, Plaintiffs allege that the English-only policy has a disparate impact on individuals originating from nations where English is not the primary language.  Plaintiffs correctly note that foreseeable knowledge of disparate impact can provide some basis for inferring discriminatory intent.  See  Hispanic Taco Vendors of Washington v. City of Pasco, 994 F.2d 676, 680 (9th Cir. 1993) ("The discriminatory impact of a governmental act may be evidence of discriminatory intent."); see also Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 487 (1997) ("[T]he impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions.").

Specifically, Plaintiffs allege, "Defendants know or should know that their English-only policy disproportionately adversely affects people of national origins other than the United States."  FAC ¶ 70.  This relatively intuitive allegation

need not be supported by statistical evidence at the pleading stage to meet the plausibility standard.  See United States v. Maricopa Cnty., Ariz., 915 F. Supp. 2d 1073, 1078 (D. Ariz. 2012) (surveying cases).  The fact that the impact of the English-only policy does not fall only on one national origin or a few national origins does not prevent the impact of the policy from being disparate.  Indeed, if an impact cannot be "disparate" when it affects multiple national origins, then any policy would be immune from challenge so long as it cast its discriminatory net widely enough.  If a policy differently affects individuals from nations where English is the primary language and nations where it is not, then the policy has a disparate impact.  See Colwell v. Dep't of Health & Human Servs., 558 F.3d 1112, 1116-17 (9th Cir. 2009) ("Discrimination against LEP individuals [is] discrimination based on national origin in violation of Title VI.").  See also Alexander v. Sandoval, 532 U.S. 275, 281 (2001) (describing regulations to ensure language services for LEP individuals as designed to "proscribe activities that have a disparate impact").

However, "it is the rare case where impact alone will be sufficient to invalidate a challenged government action." Comm. Concerning Cmty. Improvement v. City of Modesto, 583 F.3d 690, 703 (9th Cir. 2009).  "[A]bsent evidence of very stark [] disparities, impact alone is not determinative, and the Court

must look to other evidence." Id.  Here, there is no allegation of such stark disparity.  Indeed, it is highly likely that, in Hawaii, a large number of individuals from nations where English is not the primary language are nevertheless perfectly fluent in English.  Conversely, it is also possible that individuals from nations where English is the primary language do not communicate in English proficiently.  Given the absence of any alleged facts regarding the *degree* of disparate impact, intentional discrimination cannot, in this case, be inferred from impact alone.  Nevertheless, the presence of disparate impact is "an important starting point," Hispanic Taco Vendors, 994 F.2d, 680, and can support the inference of discriminatory intent, when combined with other evidence.  See Modesto, 583 F.3d at 703.

        The second set of facts that Plaintiffs allege in support of their intentional discrimination theory relates to what they describe as Defendants' "facially pretextual" decision-making.  ECF No. 66 at 17.  "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 134 (2000).  Plaintiffs allege that Defendants' puported reasons for adopting the English-only policy relate to cost and safety.  In particular, Plaintiffs allege that Defendants cited the expense of translations and safety concerns

relating to driving by non-English speakers who might be unable to interpret road signs.

Plaintiffs allege that FACE has been willing to offer competent translations at no cost to Defendants, and that this offer has been repeatedly rejected. Assuming the truth of Plaintiffs' allegations, any cost-based justification for the English-only policy is undermined. Similarly, the notion that all drivers must speak English proficiently sits uneasily with the allegation that foreign drivers are allowed on Hawaii's roads without demonstrating an ability to speak English. Plaintiffs allege that a high level of English proficiency is required to pass the written driver's exam, far greater than is needed to interpret simple road signs, which are often pictures or symbols rather than words. Plaintiffs allege, therefore, that there is no legitimate basis for arguing that LEP drivers pose a safety risk. Moreover, Plaintiffs allege that, before 2010, Defendants had translated the exam into multiple languages and, as discussed earlier, Defendants have recently reversed course and are, once again, offering translations. Defendants' allegedly vacillating attitude toward translation detracts from the credibility of the cost and safety rationales.

It may be that, in future proceedings, Defendants may advance other justifications for the English-only policy or may even contend that cost and safety were never their concerns. At

the pleading stage, however, the court, accepting the allegations in the First Amended Complaint as true, concludes that Plaintiffs have sufficiently alleged that Defendants' justifications are potentially pretextual.

This is not to say that Defendants' alleged reasons are so irrational that the English-only policy could be enjoined even under rational basis review, if that level of scrutiny applies. See, e.g., Jackson Water Works, Inc. v. Pub. Utilities Comm'n of State of Cal., 793 F.2d 1090, 1094 (9th Cir. 1986) ("All that is needed to uphold the state's classification scheme [under rational basis review] is to find that there are 'plausible,' 'arguable,' or 'conceivable' reasons which may have been the basis for the [policy]"). However, even if an alleged justification is not irrational, its unconvincing nature could constitute evidence of pretext. See Reeves, 530 U.S. at 134.

Finally, and importantly, Plaintiffs allege that they have direct evidence of discriminatory animus. Plaintiffs point to a meeting on May 15, 2013, at which they allege HDOT officials displayed hostility toward individuals from places where English is not the primary language. Plaintiffs further say that an HDOT official "never answered a single question that the Chuukese and Marshallese members of FACE's delegation asked of him" and that "HDOT's acting director for civil rights expressed surprise that there were Marshallese and Chuukese people living on all the

islands and asked why Marshallese and Chuukese people had moved to Hawaii." FAC ¶ 63. Whether these alleged circumstances are evidence of discriminatory animus may turn on context, tone, and demeanor, matters the court wishes had been more fully alleged. Nevertheless, allegations of derogatory comments go directly to establishing discriminatory intent. See Cordova v. State Farm Ins. Companies, 124 F.3d 1145, 1149 (9th Cir. 1997). Whether these comments, and the attitude allegedly displayed during the meeting, are benign or reflect animus is a matter not amenable to resolution on the pleadings alone.

Combining the three categories of factual allegations discussed above, the court concludes that, while their allegations are thin, Plaintiffs are "armed with [] more than conclusions." Iqbal, 556 U.S. at 679. Rule 8's "plausibility standard is not akin to a probability requirement." Id. at 678. It asks only "for more than a sheer possibility that [the] defendant has acted unlawfully." Id. The foreseeable disparate impact of the English-only policy, the allegedly pretextual justifications for the English-only policy, and the potentially derogatory comments made and the attitude allegedly shown by HDOT officials suffice to make Plaintiffs' claims plausible. This case presents a close call but, despite the slimness of the allegations regarding intent in the First Amended Complaint, they suffice at this stage of the litigation.

## V.      CONCLUSION

The motions to dismiss FACE for lack of standing and to dismiss the First Amended Complaint for failure to state a claim are denied.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 28, 2014.



_/s/ Susan Oki Mollway_
Susan Oki Mollway
Chief United States District Judge

Faith Action For Community Equity; Tochiro Kochiro Kovac, individually and on behalf of a class of persons in the State of Hawaii who, because of their national origins, have limited English proficiency v. State of Hawaii; Hawaii Department of Transportation; Glenn Okimoto, in his official capacity; Civ. No. 13-00450 SOM/RLP; ORDER DENYING MOTION TO DISMISS ORGANIZATIONAL PLAINTIFF FOR LACK OF STANDING AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM