IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| FAITH ACTION FOR COMMUNITY EQUITY; TOCHIRO KOCHIRO KOVAC, individually and on behalf of a class of persons in the State of Hawaii who, because of their national origins, have limited English proficiency<br><br>Plaintiff,<br><br>vs.<br><br>STATE OF HAWAII; HAWAII DEPARTMENT OF TRANSPORTATION; GLENN OKIMOTO, in his official capacity as the Director of the Hawaii Department of Transport,<br><br>Defendants. | CIVIL NO. 13-00450 SOM/RLP<br><br>ORDER DENYING COUNTERMOTIONS FOR SUMMARY JUDGMENT |

**ORDER DENYING COUNTERMOTIONS FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION.**

Plaintiffs Faith Action for Community Equity and Tochiro Kochiro Kovac (collectively, "FACE") bring this putative class action against the State of Hawaii, the Hawaii Department of Transportation ("HDOT"), and its Director. FACE alleges that HDOT's policy of offering the state driver's license examination in English only is the product of intentional discrimination, and therefore violates the Fourteenth Amendment's guarantee of equal protection and Title VI's prohibition against national origin discrimination in federally funded programs.

Before the court are countermotions for summary judgment. The court denies the motions, determining that a question of fact exists as to whether HDOT intentionally discriminated against people of various national origins when it stopped providing translated driver's license exams.

**II.    FACTUAL BACKGROUND.**

In 2001, the written portion of the state's English-language driver's license exam was translated into seven languages: Tagalog, Mandarin, Korean, Vietnamese, Japanese, and Samoan. See Decl. of Tammy Lee ¶ 3, ECF No. 126-2, PageID # 1822; Decl. of Scott Haneberg ¶ 2, ECF No. 126-3, PageID # 1828; Internal HDOT e-mail of Oct. 9, 2009, ECF No. 135-10, PageID # 2272 (listing the seven languages that the written driver's license exam had been translated into).

Effective July 10, 2006, sections 371-31 to 371-37 of Hawaii Revised Statutes provided for the state to offer persons with limited English proficiency better access to state services and programs. Section 371-33 expressly required state agencies to take reasonable steps to ensure meaningful access to services, programs, and activities by persons with limited English proficiency. Section 371-34 required each state agency to establish a plan for language access no later than July 1, 2007, and to update that plan every two years. Effective July 1, 2012,

these requirements were generally recodified as sections 321C-1 to 321C-7.

According to an e-mail from Rey Domingo of HDOT, 4,199 foreign language exams were administered in the City and County of Honolulu in 2007.  See ECF No. 135-10, PageID # 2273; see also ECF No. 135-13, PageID # 2289 (indicating that 4,177 tests were administered in 2007).

On June 13, 2008, a new Hawaii law took effect that prohibited leaving children under the age of nine unattended in vehicles.  See Haw. Rev. Stat. § 291C-121.5.  Section 286-108(a)(3) of Hawaii Revised Statutes was amended to require that applicants for driver's licenses be tested on their knowledge of this prohibition.  Because the previously translated tests did not include any question about the prohibition against leaving unattended minors in vehicles, the counties stopped using the translated exams.  See Lee Decl. ¶ 6, PageID # 1823; Haneberg Decl. ¶ 5, PageID # 1829.

Tammy Lee, the former Title VI specialist in the Office of Civil Rights of HDOT, says that, in 2008, HDOT and the Office of Civil Rights began gathering data to determine which languages the written driver's license exam had to be translated into.  See Lee Decl. ¶ 7, PageID # 1823.  Lee received an e-mail in October 2008 informing her that translated driver's license tests were no longer being offered.  See ECF No. 135-6, PageID #s 2235-36.  Lee

3

responded to that e-mail, stating that she had not known about the requirement that the exam test for knowledge of the new prohibition, but she saw "the importance of all licensed drivers understanding the criminal offense of leaving a child unattended in a vehicle. Wow, this seems like a step back in providing meaningful access, by not administering any DL exams in the already approved 7 foreign languages, but I see how the safety issue should always override providing language access." See ECF No. 135-6, PageID #s 2234.

Lee says that, between 2007 and 2012, HDOT did not receive any complaints regarding the inability of individuals with limited English proficiency to pass Hawaii's written driver's license exam given the absence of translated tests. See Lee Decl. ¶ 2, PageID # 1822. But Lee herself wrote an e-mail in September 2009 in which she notes that "[t]here have been numerous requests for the foreign language exams." ECF No. 135-9, PageID # 2268. She also noted in an e-mail of October 2010 that "Beneficiary clients of the Hawaii County Women Infants & Children Department of Health Program are interested in filing a complaint with HDOT because the Kona county DMV (and other county DMV's) are not administering the foreign language exam." ECF No. 135-10, PageID # 2269.

According to an October 2009 e-mail from Rey Domingo of HDOT that was copied to Lee, at a Hawaii Language Access

4

Conference held in September 2009, attendees indicated that they might be filing a Title VI complaint with the United States Department of Transportation. See ECF No. 135-10, PageID # 2273. Domingo also noted in that e-mail that "Translation of the violation of leaving a child unattended in a motor vehicle exam question may lead to reinstatement of the 7 initial languages exam. Translations into other languages may follow." Id.

Lee says that, given the lack of complaints, HDOT decided to concentrate its resources on producing a Language Access Plan, which would have to be updated every two years. Id. ¶ 7, PageID # 1824.

In 2009, the Office of Civil Rights of the Title VI Program issued the Language Access Plan for the State of Hawaii's Department of Transportation. See ECF No. 127-2. The plan noted that, because Hawaii received federal funds, Hawaii had to ensure that persons with limited English proficiency had meaningful access to state services. The report cited 67 Federal Register 41455 as setting forth a flexible and fact-dependent standard for providing language assistance to persons with limited English proficiency ("LEP"). The Department of Justice Guidance published at 67 Federal Register 41455 states:

> Recipients are required to take reasonable
> steps to ensure meaningful access to their
> programs and activities by LEP persons.
> While designed to be a flexible and
> fact-dependent standard, the starting point
> is an individualized assessment that balances

> the following four factors: (1) The number or
> proportion of LEP persons eligible to be
> served or likely to be encountered by the
> program or grantee; (2) the frequency with
> which LEP individuals come in contact with
> the program; (3) the nature and importance of
> the program, activity, or service provided by
> the program to people's lives; and (4) the
> resources available to the grantee/recipient
> and costs. As indicated above, the intent of
> this guidance is to suggest a balance that
> ensures meaningful access by LEP persons to
> critical services while not imposing undue
> burdens on small business, small local
> governments, or small nonprofits.

According to the 2009 Language Access Plan, based on 2006 Census Bureau statistics, 22.3% of Hawaii's population of approximately 1.3 million spoke a language other than English at home. Of that 22.3%, 18% identified themselves as speaking English "not well" or "not at all." ECF No. 127-2, PageID # 1875. The same report identified the "top languages spoken by Hawai`i's LEP population in descending order . . . [as] Ilocano, Japanese, Tagalog, Chinese, Korean, Vietnamese, Visayan (Cebuano), Cantonese, Other Pacific Languages (Chuukese, Marshallese, Yapese), and Spanish." Id.

Scott Haneberg, the Motor Vehicle Safety Administrator for the Motor Vehicle Safety Office of HDOT, says that, in 2010, the Hawaii legislature considered enacting other laws and requiring those laws to be tested on the written driver's license exam. He says that, to limit resources spent on translations, HDOT wanted to do all necessary translations at one time.

6

Accordingly, HDOT wanted to know both what additional questions needed to be on the exams and which languages to translate the exam into.  See Haneberg Decl. ¶ 6, PageID # 1829.

HDOT says that, between 2008 and 2013, it made no decision to refrain from translating the written driver's license exam.  See Lee Decl. ¶ 11, PageID # 1826; Haneberg Decl. ¶ 9, PageID # 1830.  It says that, during that period, it was working with the counties to determine how to best reinstitute the translated exams, but that, given the lack of complaints, the shortage of personnel, and other projects, the Office of Civil Rights concentrated primarily on other projects.  See id.

Marlene Young became the Title VI Coordinator for HDOT's Office of Civil Rights in 2012.  She says that, after the legislature required that applicants be tested on their knowledge of the prohibition against leaving children unattended in vehicles, HDOT began working with the counties "to determine the optimum manner and scope for the new translations."  Decl. of Marlene Q. Young ¶ 4, ECF No. 126-4, PageID # 1834.  She says that the counties were responsible for having LEP persons complete surveys to help determine which languages the test should be translated into.  Id.

On May 14, 2013, representatives from FACE and HDOT met to discuss translating the driver's license exams into Ilocano, Marshallese, and Chuukuse, in addition to the previous languages

7

the exams had been translated into.  See ECF No. 135-27, PageID # 2348.  The Memorandum discussing what happened at that meeting indicates that a Chuukuse interpreter named Kiku gave a "long speech about the need for Maui's Chuukuse to have the driver's license exam translated."  Id.

Clifton Harty, HDOT's acting Civil Rights Coordinator, says that he worked with Young to evaluate which languages the driver's license exam was to be translated into.  They completed a report on July 24, 2013.  See Decl. of Clifton Harty ¶ 8, ECF No. 126-5, PageID # 1839.  Harty says that, although application of the 4-factor test did not require translation into Chuukese or Marshallese, he decided that the tests would be translated into those languages anyway.  See id. ¶ 9, PageID #s 1839-40.

On July 24, 2013, HDOT requested funding for translating the driver's license exam.  See ECF No. 135-3, PageID # 2209.  That request noted that the approximate cost of translating the exam into Spanish, Ilocano, Chuukuse, and Marshallese was $600 per language.  See ECF No. 135-3.

On February 14, 2014, HDOT announced that, beginning on March 17, 2014, the Hawaii driver's license exam would be available in English, Chinese, Japanese, Korean, Vietnamese, Tongan, Samoan, Tagalog, Ilocano, Hawaiian, Spanish, Chuukuse, and Marshallese.  See ECF No. 135-31, PageID # 2362.[1]

---

[1]Left out from this list of languages were Visayan, Cantonese, and Yapese, which were mentioned in the 2009 Language

Haneberg, Young, and Harty say that they did not intentionally discriminate against FACE or its members. Haneberg Decl. ¶ 14, PageID # 1831; Young Decl. ¶ 14, PageID # 1836; Harty Decl. ¶ 11, PageID # 1840.

**III.     SUMMARY JUDGMENT STANDARD.**

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2010). See Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). Movants must support their position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

---

Access Plan, while Tongan, Samoan, and Hawaiian were added.

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).

The nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  T.W. Elec. Serv., Inc., 809 F.2d at 630.  At least some "'significant probative evidence tending to support the complaint'" must be produced.  Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)).  See Addisu, 198 F.3d at 1134 ("A

scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587). Accord Addisu, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

All evidence and inferences must be construed in the light most favorable to the nonmoving party. T.W. Elec. Serv., Inc., 809 F.2d at 631. Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. Id. When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." Id.

**IV. ANALYSIS.**

  **A. There is a Question of Fact as to Whether HDOT Intentionally Discriminated Against People Based on Their National Origins.**

In the First Claim for Relief in the First Amended Complaint, FACE asserts a violation of 42 U.S.C. § 1983 based on an alleged violation of its Equal Protection Clause rights.

In relevant part, § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws. This is essentially a direction that all persons similarly situated be treated alike. See High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 570-71 (9th Cir. 1990).

In the Second Claim for Relief in the First Amended Complaint, FACE asserts a violation of section 601 of Title VI, 42 U.S.C. § 2000d, which states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be

12

subjected to discrimination under any program or activity receiving Federal financial assistance."

The Ninth Circuit has stated that "violations of equal protection and Title VI require similar proofs—-plaintiffs must show that actions of the defendants had a discriminatory impact, and that defendants acted with an intent or purpose to discriminate based upon plaintiffs' membership in a protected class." Comm. Concerning Cmty. Improvement v. City of Modesto, 583 F.3d 690, 702-03 (9th Cir. 2009).

Intentional discrimination can occur in any of three ways: (1) a law or policy may explicitly classify citizens on the basis of a protected category, see, e.g., Hunter v. Erickson, 393 U.S. 385 (1969); (2) a facially neutral law or policy may be applied differently on the basis of membership in a protected category, see, e.g., Wayte v. United States, 470 U.S. 598 (1985); or (3) a facially neutral law or policy may be applied evenhandedly but motivated by discriminatory intent. See, e.g., Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977). As noted in this court's order of April 28, 2014, FACE alleges the third type of discrimination--"that the facially neutral English-only policy was motivated in part by an animus against people from national origins where English is not a primary language." See ECF No. 80, PageID # 1428.

There is no cause of action for disparate impact under either the Equal Protection Clause or Title VI. See Washington v. Davis, 426 U.S. 229, 239 (1976) (holding that government action is not "unconstitutional solely because it has a racially disproportionate impact"); see also Alexander v. Sandoval, 532 U.S. 275, 280 (2001) (noting that "it is beyond dispute . . . that § 601 [of Title VI] prohibits only intentional discrimination"). Nevertheless, disparate impact "is not irrelevant" to a claim of intentional discrimination. Arlington Heights, 429 U.S. at 265.

In the context of a gender discrimination claim, the Supreme Court stated that, while the disparate impact of a facially neutral statute provides an "important starting point" for judicial review, purposeful discrimination is what offends the Constitution. See Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 274, 279 (1979). Purposeful discrimination "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." Id. at 279 (internal quotation omitted). If the statute's impact cannot be plausibly explained on a neutral ground, the "impact itself would signal that the real classification made by the law was in fact not neutral." Id. at

14

275. However, "it is the rare case where impact alone will be sufficient to invalidate a challenged government action." Comm. Concerning Cmty. Improvement v. City of Modesto, 583 F.3d 690, 703 (9th Cir. 2009). "[A]bsent evidence of very stark [] disparities, impact alone is not determinative, and the Court must look to other evidence." Id.

> Plaintiffs cannot prevail in this case by simply showing that the English-only policy disproportionately harms LEP individuals, or that Hawaii officials have an animus against LEP individuals for reasons unrelated to membership in a protected class. For example, even if Plaintiffs could show that the English-only policy was created in part because officials dislike having people in Hawaii who do not speak English, that alone would not suffice to prevail on the merits. Of course "language is close[ly related to] national origin [and] restrictions on the use of languages may mask discrimination against specific national origin groups or, more generally, conceal nativist sentiment." Yniguez v. Arizonans for Official English, 69 F.3d 920, 947-48 (9th Cir. 1995), judgment vacated on other grounds by Arizonans for Official English v. Arizona, 520 U.S. 43 (1997). Still, Plaintiffs would ultimately have to demonstrate that animus against LEP individuals, or any particular linguistic group, reflects an underlying animus based on national origin.

ECF No. 80, PageID # 1429.

Foreseeable knowledge of disparate impact can provide some basis for inferring discriminatory intent. See Hispanic Taco Vendors of Washington v. City of Pasco, 994 F.2d 676, 680

15

(9th Cir. 1993) ("The discriminatory impact of a governmental act may be evidence of discriminatory intent."); see also Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 487 (1997) ("[T]he impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions.").

"Proof that the defendant's explanation is unworthy of credence" is circumstantial evidence of intentional discrimination. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 134 (2000). To determine whether HDOT intentionally discriminated against people based on their national origins, this court may also consider

> whether the defendant's actions were motivated by a discriminatory purpose by examining (1) statistics demonstrating a "clear pattern unexplainable on grounds other than" discriminatory ones, (2) "[t]he historical background of the decision," (3) "[t]he specific sequence of events leading up to the challenged decision," (4) the defendant's departures from its normal procedures or substantive conclusions, and (5) relevant "legislative or administrative history."

Pac. Shores Props., LLC v. City of Newport Beach, 730 F.3d 1142, 1158-59 (9th Cir. 2013).

There is a question of fact as to whether HDOT intentionally discriminated against people of various national origins when it ceased providing translated driver's license exams. HDOT says that it stopped providing translated exams in

2008 given the need to add a question about leaving young children unattended in vehicles. HDOT then says that, given staffing and emphasis on preparing a Language Access Plan, it delayed conducting the studies necessary to determine which languages to offer the exam in. HDOT says that the translation of the exam was further delayed because it thought the legislature was going to require that further questions be added to the exam and HDOT only wanted to translate the exam once. HDOT says it always intended to offer translated exams, and that its principals had no intention of discriminating against anyone. Under these circumstances, a reasonable jury might determine that HDOT did not intentionally discriminate on the basis of national origin.

On the other hand, HDOT knew that it had administered over 4,000 exams in various languages in 2007 in the City and County of Honolulu alone. It also knew that translating a single question would have involved minimal time and resources, costing only about $600 per language. Given these circumstances, a jury might reasonably infer from the delay between 2008 and 2014 that the state intended to discriminate against various national origins, foreseeing the disparate impact on non-U.S. citizens. Lee claims that part of the decision not to translate the exams sooner was the absence of complaints about not having translated exams. But Lee knew that, even if no formal complaints had been

17

filed, complaints had been threatened and requests had been made to take the exams in other languages. A jury might therefore determine that Lee's reason for not translating the exam sooner was pretextual.

Although FACE characterizes HDOT's attitude at the May 14, 2013, meeting as having been hostile, this court cannot determine on the present record whether the comments and the attitude allegedly displayed during the meeting reflected animus.

Ultimately, the trier of fact must decide whether HDOT intentionally discriminated against people of various national origins when HDOT stopped providing the translated written driver's license exams. Accordingly, the countermotions for summary judgment are denied.

### B. Kovac is Not Necessarily Precluded From Being a Class Representative.

HDOT appears to be arguing that Kovac is not a proper class representative because he has recently failed a translated driver's license exam. See ECF No. 126-1, PageID #s 1804-05. The court notes, however, that just because Kovac failed the exam once does not mean that, had he been allowed to take the exam between 2008 and 2013, he would not have passed it during that entire period. Nothing in the record indicates that he was restricted to taking the exam once.

**V.     CONCLUSION.**

A question of fact exists as to whether HDOT intentionally discriminated against people of various national origins.  This questions of fact precludes the countermotions for summary judgment.

The parties are ordered to contact the Magistrate Judge assigned to this case to schedule a settlement conference at the earliest available date.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, February 23, 2015.



  /s/ Susan Oki Mollway  
Susan Oki Mollway  
Chief United States District Judge

Faith Action For Community Equity; Tochiro Kochiro Kovac, individually and on behalf of a class of persons in the State of Hawaii who, because of their national origins, have limited English proficiency v. State of Hawaii; Hawaii Department of Transportation; Glenn Okimoto, in his official capacity; Civ. No. 13-00450 SOM/RLP; ORDER DENYING COUNTERMOTIONS FOR SUMMARY JUDGMENT